# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE GRAND JURY PROCEEDINGS

Misc. No. 98-55 (NHJ)
(consolidated with Misc. No. 98-177 and
Misc. No. 98-228)

**FILED**

**UNDER SEAL**

SEP 25 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

### ORDER TO SHOW CAUSE

On June 19, 1998, the Court ordered the Office of the Independent Counsel ("OIC") and

individual members therein to show cause why they should not be held in contempt for violations

of Federal Rule of Criminal Procedure 6(e)(2). The Court also set forth procedures to be

followed at a show cause hearing that would include the participation of counsel for President

Clinton, the White House, Monica Lewinsky, Bruce Lindsey and Sidney Blumenthal

(collectively "movants").[1]  In a second Order, entered on June 26, 1998, the Court clarified its

June 19 Order and outlined further procedures related to the show cause hearing including

permitting the movants to undertake limited discovery of press contacts with the OIC. The OIC

appealed the Court's procedural rulings permitting movants to take discovery and to participate

in the show cause hearing. In its emergency appeal, the OIC did not contest the Court's finding

that prima facie violations of Rule 6(e) had been established by at least six news reports. Rather,

the OIC strenuously objected to the procedures that the Court had adopted in order to conduct the

show cause hearing; the OIC argued that any show cause hearing and related discovery must be

conducted ex parte and in camera. The Court of Appeals vacated the procedural aspects of the

_____

[1]  Monica Lewinsky has withdrawn her motion for an order to show cause and therefore
she is no longer included among the movants in this matter.

13

Court's June 19 and June 26 Orders and remanded for further proceedings consistent with its

Opinion.  See In re Sealed Case, Nos. 98-3077, 98-3078, 98-3079 and 98-3081, 1998 WL

455602 (D.C. Cir. August 3, 1998) (per curiam).

Presently before the Court is the OIC's ex parte memorandum requesting that the Court

outline further procedures for the OIC and its members to show cause why they should not be

held in contempt.  The Court will now determine which additional press reports raised in

movants' motions to show cause constitute prima facie violations of Rule 6(e) and will set forth

the procedures, in accordance with the decision of the Court of Appeals, that will guide the Court

in deciding movants' motions.  Such procedures shall include referral to a Special Master.

I.      **Standards for Establishing a Prima Facie Violation of Rule 6(e)(2)**

Rule 6(e) provides, in relevant part, that "an attorney for the government, or any [such

government personnel . . . as are deemed necessary by an attorney for the government to assist an

attorney for the government in the performance of such attorney's duty to enforce federal

criminal law] shall not disclose matters occurring before the grand jury, except as otherwise

provided in these rules.  . . .  A knowing violation of Rule 6 may be punished as a contempt of

court."  Fed. R. Crim. P. 6(e)(2) & 6(e)(3)(A)(ii).  It is clear that the secrecy requirements of Rule

6(e) apply to the OIC.  In re Sealed Case, 1998 WL 455602, at *16 n.2 (citing In re North, 16

F.3d 1234, 1245 (D.C. Cir. 1994)).

Our courts have consistently recognized the importance of secrecy to the proper

functioning of our grand jury system, specifically noting "several distinct interests served by

safeguarding the confidentiality of grand jury proceedings."  Douglas Oil Co. of Calif. v. Petrol

Stops N.W., 441 U.S. 211, 218 (1979).  The Supreme Court outlined the "several distinct

interests" protected by Rule 6(e) as follows:

> [f]irst, if preindictment proceedings were made public, many prospective
> witnesses would be hesitant to come forward voluntarily, knowing that those
> against whom they testify would be aware of that testimony. Moreover, witnesses
> who appeared before the grand jury would be less likely to testify fully and
> frankly, as they would be open to retribution as well as to inducements. There
> also would be the risk that those about to be indicted would flee, or would try to
> influence individual grand jurors to vote against indictment. Finally, by
> preserving the secrecy of the proceedings, we assure that persons who are accused
> but exonerated by the grand jury will not be held up to public ridicule.

Id. at 219. Therefore, enforcing Rule 6(e) is of the utmost importance to the integrity of our

grand jury process.

For this reason, the Court of Appeals has held that a district court "must conduct a 'show

cause' hearing" if a motion for order to show cause establishes a prima facie violation of Rule

6(e)(2). Barry v. United States, 865 F.2d 1317, 1321 (D.C. Cir. 1989) (emphasis added). To

establish a prima facie case, movants must show that "media reports disclosed information about

'matters occurring before the grand jury' and indicated that the sources of the information

included attorneys and agents of [OIC]." Id. (citations omitted). Once a prima facie case is

established, "the burden of rebutting the prima facie case will lie with the [Independent Counsel],

who must now come forward with evidence, in whatever form the district court requires

(including affidavits, depositions, production of documents, or live testimony) to rebut the

inferences drawn from the news articles that established the prima facie case of a Rule 6(e) leak

to the press by personnel in or 'close to' the [Independent Counsel's] office." In re Sealed Case,

1998 WL 455602, at *14. If the Court finds that a member of the OIC violated Rule 6(e)(2), it

may order appropriate relief such as contempt sanctions and equitable relief. See Barry, 865

F.2d at 1321.

A.   "Matters Occurring Before the Grand Jury"

In order to establish a prima facie case, movants must first demonstrate that the media

reports disclosed "matters occurring before the grand jury." Id. The D.C. Circuit has held that

the scope of grand jury secrecy is necessarily broad in order to properly effectuate the several

distinct objectives of Rule 6(e). Fund for Constitutional Gov't v. National Archives & Records

Serv., 656 F.2d 856, 869 (D.C. Cir. 1981). "It compasses not only the direct revelation of grand

jury transcripts but also the disclosure of information which would reveal 'the identities of

witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the

deliberations or questions of the jurors, and the like.'" Id. (quoting SEC v. Dresser Indus., Inc.,

628 F.2d 1362, 1382 (D.C. Cir. 1980) (en banc)) (emphasis added).  In light of the "broad reach

of grand jury secrecy," the Court of Appeals has held that Rule 6(e) covers "naming or

identifying grand jury witnesses; quoting or summarizing grand jury testimony; evaluating

testimony; discussing the scope, focus and direction of the grand jury investigations; and

identifying documents considered by the grand jury and conclusions reached as a result of the

grand jury investigations."  Id. (emphasis added).

In addition, "the fact that [a witness] was subpoenaed to testify, the fact that he invoked

[a] privilege in response to questions, [and] the nature of the questions asked" of him are

"according to our precedent 'matters occurring before the grand jury.'"  In re Motions of Dow

Jones & Co., Inc., 142 F.3d 496, 501 (D.C. Cir. 1998) (citing SEC v. Dresser Industries, Inc.,

628 F.2d at 1382).  Furthermore, statements by prosecutors which disclose when an indictment

will be presented to the grand jury, who will be charged in the indictment and what crimes will

be charged also violate the secrecy requirement of Rule 6(e).  See In re Grand Jury Investigation,

4

Lance, v. Dep't of Justice, 610 F.2d 202, 218 (5th Cir. 1980).  "[T]he touchstone is whether

disclosure would tend to reveal some secret aspect of the grand jury's investigation."  Senate of

the Commonwealth of Puerto Rico v. United States Dep't of Justice, 823 F.2d 574, 582 (D.C.

Cir. 1987) (citation omitted).

 Moreover, the Court of Appeals recently reaffirmed that "matters occurring before the

grand jury" include "not only what has occurred and what is occurring, but also what is likely to

occur."  In re Dow Jones, 142 F.3d at 499-500 (citing SEC v. Dresser Indus., Inc., 628 F.2d at

1382 and Fund for Constitutional Gov't, 656 F.2d at 869) (emphasis added).[2]  Clearly the

prohibition on disclosure found in Rule 6(e) would have little force if prosecutors could reveal

with impunity the substance of a prospective witness's testimony and comment on his or her

credibility prior to the witness's appearance before the grand jury.

 **B. Attribution of Source**

 In addition to establishing that media reports disclosed "matters occurring before the

---

[2]  The Court notes that, in the course of addressing proper procedures for the present
show cause hearing, the Court of Appeals quoted the foregoing language from In re Dow Jones
and then cautioned of "the problematic nature of applying so broad a definition [of 'matters
occurring before the grand jury'], especially as it relates to the 'strategy or direction of the
investigation,' to the inquiry as to whether [the OIC] has made unauthorized disclosures." In re
Sealed Case, 1998 WL 455602, at *16 n.12.  However, for nearly two decades, controlling law in
the D.C. Circuit has explicitly and repeatedly recognized that the necessarily broad reach of Rule
6(e) confidentiality encompasses "the strategy or direction of the investigation," in other words
"what is likely to occur" during the course of the grand jury investigation.  See In re Dow Jones,
142 F.3d at 499-500; Senate of the Commonwealth of Puerto Rico, 823 F.2d at 582; Fund for
Constitutional Gov't, 656 F.2d at 869-70; SEC v. Dresser Indus., Inc., 628 F.2d at 1382.
Moreover, as the OIC did not appeal this Court's interpretation of "matters occurring before the
grand jury," the Court of Appeals footnote on this topic is mere dictum.  Therefore, the Court
does not believe that the dictum in this footnote was intended to overrule sub silentio the well-
established law of this Circuit.  See In re Sealed Case, 1998 WL 455602, at *3 (stating that such
a method of overruling established legal precedent is "implausible").

grand jury," movants must also show that such reports "indicated that the source of the information included attorneys and agents of the [OIC]." Barry, 865 F.2d at 1321. When deciding whether movants have met their burden, the Court must treat all statements in the news reports as true with respect to what was disclosed and by whom. See Lance, 610 F.2d at 219; see also Barry, 865 F.3d at 1326 (noting that "complainants in Rule 6(e)(2) cases 'almost never have access to anything beyond the words of the [news] report.'") (quoting Lance, 610 F.2d at 219). Thus, if a news report explicitly identifies the source of information protected by Rule 6(e)(2), the Court must accept this attribution as correct for purposes of the prima facie case.

While an article expressly identifying the OIC as the source of the Rule 6(e) information clearly supports a prima facie case, "[t]he article submitted need only be susceptible of an interpretation that the information reported was furnished by an attorney or agent of the [OIC]; in fact, '[i]t is not necessary for [an] article to expressly implicate the [OIC] as the source of the disclosures if the nature of the information disclosed furnishes the connection.'" In re Sealed Case, 1998 WL 455602, at *16 n.7 (quoting Barry, 865 F.2d at 1325) (emphasis added). For instance, "[t]he precise attribution of a source in one [press report] . . . may give definition of a vague source reference in others because of their context in time or content." Id. at 1326 (citations omitted). Additionally, "attorneys and agents of the Government" need not be the sole source of the disclosure of Rule 6(e) material, but need only be "included" among the sources. Id. at 1321.

II.     **Application of Standards to Movants' Motions for Order to Show Cause**

In its June 19 Order to Show Cause, the Court found that the following six media reports constitute prima facie violations of Rule 6(e) or violations of this Court's orders prohibiting

disclosure of information relating to the grand jury investigation:

1.  Thomas Galvin, "Monica Keeping Mum — For Now Fends Off Query on Internal Affairs," New York Daily News, January 23, 1998;

2.  Don Van Natta, Jr. & John M. Broder, "Lewinsky Would Take Lie Test in Exchange for Immunity Deal," New York Times, February 2, 1998;

3.  Claire Shipman, "Ken Starr Rejects Lewinsky's Immunity Deal," NBC Nightly News, February 4, 1998;

4.  Fox News Broadcast, May 6, 1998;

5.  Scott Pelley, "Exclusive Information About Kenneth Starr's Next Moves," CBS Evening News, May 8, 1998; and

6.  Steven Brill, "Pressgate," Brill's Content, August 1998.[3]

In its June 19 Order, the Court also directed movants to identify other press reports that

they believe establish additional prima facie violations of Rule 6(e) by the OIC. In response,

movants identified 18 additional media reports. See Movants' Listing of Key News Reports for

---

[3] While the "Pressgate" article may not, in and of itself, constitute a Rule 6(e) violation, it provides further support for the prima facie violations of Rule 6(e) established by the other media reports at issue. In other words, it helps to provide the context for the other press reports. The Independent Counsel's admission to Mr. Brill that he and Deputy Independent Counsel Jackie Bennett speak to reporters on condition of anonymity and his statement to Mr. Brill that Rule 6(e) does not apply to "what witnesses tell FBI agents or us [the OIC] before they testify before the grand jury" strongly supports the Court's findings of prima facie violations of Rule 6(e) by the OIC. See "Pressgate," at 132. Mr. Brill's assertions that he has "personally seen internal memos from inside three news organizations that cite Starr's office as a source" and that "six different people who work at mainstream news organizations have told [him] about specific leaks" also lends support to the Court's findings of prima facie violations. Id. at 131, 150.

July 6, 1998, Show Cause Hearing, June 24, 1998.[4]  Pursuant to the above-cited law governing

Rule 6(e) show cause motions, the Court will now review these reports and determine whether

they also constitute prima facie violations of Rule 6(e).

> 7.    **David Bloom, "Newest Clinton Sex Scandal Causing Republican Calls
>        for Impeachment," <u>NBC Nightly News</u>, January 21, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

his report, Mr. Bloom stated that "<u>federal law enforcement sources tell NBC News</u> they're

prepared to offer the young intern a choice between immunity and prosecution.  <u>One law

enforcement source put it this way</u>, quote, 'We're going to dangle an indictment in front of her

and see where that gets us.'"  (emphasis added).  The report identifies the sources as members of

federal law enforcement which, given the context and content of these statements, likely refers to

attorneys or agents of the OIC.  Moreover, the substance of the statement indicates that an

indictment is being considered and identifies a target of the grand jury investigation.  The leak

from the law enforcement source also reveals the strategy or direction of the investigation.

> 8.    **David Bloom, "President Clinton Faces Allegations of Affair with
>        Former White House Intern, Then Telling Her to Lie About It," <u>NBC
>        News at Sunrise</u>, January 22, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this television segment, Mr. Bloom reported that:

---

[4]  In the interest of judicial economy and in order to avoid overburdening the Special
Master, the Court has chosen to focus on the 24 "key news reports" identified by movants, rather
than making prima facie determinations regarding 111 different press reports raised by movants
in five separate submissions.  See Motions for Order to Show Cause of February 9, May 6,  and
June 16, 1998; and Supplemental Memoranda in Support of Motions for Order to Show Cause of
May 12 and June 24, 1998.

> [p]rosecutors suspect the president and his longtime friend, Vernon Jordan, tried
> to cover up allegations that Mr. Clinton was involved sexually with former White
> House intern Monica Lewinsky and other women — which is why this document,
> obtained last night by NBC News, could be a smoking gun.  It's called "Points to
> Make in Affidavit."  Prosecutors say it might as well be called "How to Commit
> Perjury in the Paula Jones Case." . . .  Where did this document come from?
> Prosecutors suspect the president's allies of witness tampering.  (emphasis added).

The report explicitly identifies "prosecutors" as disclosing evidence gathered as part of the grand

jury investigation.  This evidence, the "talking points" document, was likely to be presented to

the grand jury.  The law in this Circuit makes it perfectly clear that government attorneys may

not reveal documentary evidence that is likely to be presented to the grand jury.  Furthermore,

these statements also reveal the scope, focus, and direction of the grand jury investigation — a

plain violation of Rule 6(e).

9.    **Michael Isikoff, "Diary of a Scandal," <u>Newsweek (America Online
      ed.)</u>, January 22, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this online news article, Mr. Isikoff reports:

> It is not clear who prepared these talking points, but Starr believes that Lewinsky
> did not write them herself.  He is investigating whether the instructions came from
> Jordan or other friends of the president. . . .  NEWSWEEK told Starr's deputies
> that the magazine was planning to run with the story in the issue that appeared
> that Monday. . . .  Starr's deputies asked NEWSWEEK to hold off. . . .  Starr
> was hoping to confront Lewinsky and persuade her to cooperate as a witness for
> the prosecution.  Starr's deputies did not want to tip off Lewinsky or Jordan or the
> White House. . . .  According to Starr's deputies, the fear that Lewinsky's name
> would become widely known was enough to torpedo the negotiations between
> Starr and her Lewinsky's [sic] lawyers.  As of now, Lewinsky is not cooperating.
> According to knowledgeable sources, Starr is now considering whether to indict
> her for perjury.  (emphasis added).

Here, Starr's deputies are directly cited as one of the sources for this story.  Furthermore, the

attribution to "knowledgeable sources" regarding the potential indictment of Ms. Lewinsky and

Mr. Starr's <u>beliefs</u> about the authorship of the talking points, particularly given the context of the

entire article and the nature of the information disclosed, strongly suggests a source within the

OIC. Moreover, the substance of the statements relating to possible indictments and the strategy

or direction of the grand jury investigation constitutes "matters" covered by Rule 6(e).

> 10. **Francis X. Clines & Jeff Gerth, "Subpoenas Sent as Clinton Denies Reports of an Affair with Aide at White House," <u>New York Times</u>, January 22, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this news article, it is reported that:

> [d]etails spilled out through the day, fueled by more than a dozen tape recordings
> of the intern that a friend had secretly made, some of them with a hidden F.B.I.
> tape recorder, <u>said lawyers close to the investigation</u>.  Late tonight, F.B.I. agents
> sought interviews with people with whom the intern might have confided in at the
> White House and the Pentagon . . . .  <u>Mr. Starr</u>, whose office was busy today
> issuing subpoenas and <u>considering</u> possible immunity for key witnesses, <u>was
> reportedly investigating</u> possible evidence that the President himself left in the
> alleged affair, including telephone messages subsequently re-recorded secretly for
> prosecutors.  <u>Lawyers familiar with the contents of some of the tapes said</u> that Ms.
> Lewinsky told of the President advising her that if anyone asked about the affair,
> she was absolutely to deny it.  (emphasis added).

Although this article does not contain direct attribution to sources within the OIC, there is a

strong inference that at least one of the sources was an attorney or agent of the OIC, particularly

in light of the disclosure of information known only to members of the OIC such as what FBI

agents and attorneys in Mr. Starr's office were thinking and actively investigating.  The

substance of these leaks relates to evidence being gathered pursuant to grand jury subpoenas and

the consideration of immunity deals for potential grand jury witnesses.  Such matters are

protected by Rule 6(e).  Furthermore, the Independent Counsel has admitted that OIC attorneys

speak to reporters on a not-for-attribution basis.  This admission reinforces the already strong

inference that the information came from the OIC.

> 11.    **Phil Jones, "Independent Counsel Kenneth Starr Moves Quickly in
>         His Investigation Regarding President Clinton and Intern Monica
>         Lewinsky," CBS Evening News, January 23, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  Mr.

Jones reports that "two sources familiar with the Independent Counsel's investigation tell CBS

News that Kenneth Starr is, quote, 'absolutely convinced that Monica Lewinsky was telling the

truth when she was recorded by her friend, Linda Tripp.'  . . .  Starr isn't commenting on

anything publicly, but our sources say he is aware that he must move quickly on this matter; that

he can't dally on the Lewinsky case like he has on other matters.  Starr wants to grant Lewinsky

immunity, but not until she provides information on what truthful facts she would give in return

for immunity." (emphasis added).  Mr. Jones' "sources familiar with the Independent Counsel's

investigation" purport to disclose the Independent Counsel's thoughts on several topics that are

clearly covered by Rule 6(e), including the credibility of Ms. Lewinsky, a likely grand jury

witness, and also the status of immunity negotiations with this witness.  This insight into the

strategy or direction of the grand jury investigation implicates attorneys or agents working for the

OIC as the sources.

12.  **Susan Schmidt and Peter Baker, "Ex-Intern Rejected Immunity Offer in Probe,"** The Washington Post, **January 24, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this article, it is reported that:

> [f]ederal investigators last week offered former White House aide Monica
> Lewinsky immunity from prosecution if she would cooperate in their
> investigation into whether President Clinton tried to persuade her to deny an affair
> under oath, but Lewinsky turned the offer down.  The offer was described
> yesterday by sources close to independent counsel Kenneth W. Starr . . . .  For all
> of yesterday's the (sic.) public jousting between the lawyers, a source said Starr's
> investigators searched her Watergate apartment with her family's permission on
> Thursday and came away with a variety of personal items, including letters, that
> [Starr's investigators] hope might help establish a link between Clinton and the
> young woman.  According to sources familiar with the investigation, Lewinsky
> has said that the president gave her a pin and a book of poetry, . . . .  According to
> a source close to the prosecutors, [Ms. Lewinsky's mother Marcia Lewis] was
> puzzled about why they were intent on making a criminal case at all, saying
> "What's the big deal?  So she lied and tried to convince someone else to lie."
> (emphasis added).

Statements in this article are repeatedly attributed to sources close to the Independent Counsel,

sources familiar with the investigation, and sources close to the prosecutors.  Given the nature of

the information disclosed, attorneys or agents of the OIC are implicated as the sources.

Moreover, the article strongly suggests that some of the disclosures come from sources who are

themselves receiving information from attorneys or agents of the OIC.  If at anytime the

members of the OIC were disclosing protected information to "sources," who in turn were

passing that information on to reporters, that of course would also constitute violations of Rule

6(e).  In substance, the information revealed in this article details immunity negotiations with a

potential grand jury target and also reveals the scope, focus, and direction of the grand jury

investigation.

13.   **Claire Shipman, "Still No Deal Between Monica Lewinsky and Whitewater Prosecutor Ken Starr Regarding White House Sex Scandal," <u>NBC News Special Report</u>, January 25, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this television segment, Ms. Shipman reported that "<u>sources in Ken Starr's office tell us</u> that they are investigating [a report that at some point someone caught the president and Ms. Lewinsky in an intimate moment], but they haven't confirmed it."  (emphasis added).  In this report, the attribution to the OIC is explicit and the OIC sources reveal a specific detail of the strategy or direction of their investigation, directly breaching grand jury confidentiality.

14.   **Howard Fineman & Karen Breslau, "Sex, Lies and the President," <u>Newsweek</u>, February 2, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this article, it is reported that "[a]t the <u>direction of special prosecutor Starr</u>, the FBI placed a 'wire' listening device on Lewinsky's friend Linda Tripp.  The resulting tape of Lewinsky-Tripp conversations could be especially strong evidence in a federal court.  And on one of them, <u>to which NEWSWEEK gained access</u>, Lewinsky gives clues to what might be an effort to silence her, involving the president and his close friend Washington lawyer Vernon Jordan."  Although not directly attributed to a source in the OIC, the content and context of the report suggests that Newsweek gained access to the FBI tape through an attorney or agent of the OIC as this tape was made under the direction of agents working for the OIC.  The testimony on this tape from a potential target of the grand jury investigation clearly is evidence likely to presented to the grand jury and therefore is protected from disclosure by Rule 6(e).

13

15.   **Francis X. Clines, "Stephanapoulos Testifies as Beset Lewinsky Flies Home," The New York Times, February 4, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this article, it is reported that "'[w]e are trying to get to the truth of what would be, if proven, serious charges,' Mr. Starr declared in a brief interview today with CNN.  His investigators are pursuing a number of leads, including forensic testing of items taken from Ms. Lewinsky, who reportedly said on the tapes that she had a dress that had been stained by the President in a sexual encounter.  One of her dresses was recently tested, with negative results, said one Federal investigator, who would not say what else might be tested." (emphasis added).  The nature of this information regarding specific leads and investigative methods of the OIC investigation strongly suggests that the Federal investigator cited in the story is working with the OIC.  The substance of these leaks also reveals the scope, focus, and direction of the grand jury investigation.

16.   **Jackie Judd, "Clinton Team on the Offensive," World News Tonight with Peter Jennings, January 30, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this television segment, Ms. Judd reports that "[a]ccording to law enforcement sources, Starr so far has come up empty in a search for forensic evidence of a relationship between Mr. Clinton and Lewinsky.  The sources say a dress and other pieces of clothing were tested, but that they had all been dry cleaned before the FBI picked them up from Lewinsky's apartment." (emphasis added).  A source for the story is identified as a member of law enforcement.  Given the context and nature of the investigatory information disclosed, the law enforcement sources are likely to

14

be attorneys or agents working for the OIC.  Moreover, the substance of the story pertains to

evidence being gathered as part of the grand jury investigation, a matter within the protection of

Rule 6(e).

       17.      **Scott Pelley, "Talks between Monica Lewinsky's Attorney and
Prosecutors at an Impasse," <u>CBS Morning News</u>, January 30, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this story, it is reported that "<u>the prosecution acknowledged</u> what it hoped would be key evidence

is not. . . .  <u>CBS news has learned</u> that no DNA evidence or stains have been found on a dress

that belongs to Monica Lewinsky.  The dress and other clothes were seized by the FBI from

Lewinsky's apartment after she told a friend they may contain some evidence.  But again, the

FBI lab has found no DNA evidence." (emphasis added).  This report directly attributes

information regarding physical evidence to a prosecution source and the disclosure reveals the

scope, focus, and direction of the grand jury investigation.

       18.      **John King, "Investigating the President: Lewinsky Immunity Talks
Collapse," <u>CNN Early Edition</u>, February 5, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this report, Mr. King states that "<u>[s]ources in Starr's office suggesting</u> (sic.) that if Monica

Lewinsky does not negotiate an immunity deal quite soon that they are prepared to go ahead and

press charges against her." (emphasis added).  Mr. King attributes his reporting directly to

sources in Starr's office.  According to this news report, these OIC sources disclosed the status of

immunity negotiations with a potential target of the grand jury and the possible indictment of this

target.

19.   **Don Van Natta, Jr. & James Bennet, "Starr Turns Down Limit on Questions to Clinton's Aides,"** New York Times, **February 5, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this article, it is reported that "[o]ne official involved in the discussions about whether Ms. Lewinsky would cooperate with Mr. Starr's investigation said prosecutors had set a deadline of Friday at noon for her lawyers to indicate whether she would talk with prosecutors.  If the deadline passes without a deal, the official said, Ms. Lewinsky could face prosecution." (emphasis added).  This disclosure regarding the status of immunity negotiations with a grand jury target and her possible indictment by the grand jury is attributed to an official involved in the immunity negotiations.  The only officials who would have been involved in these negotiations are members of the OIC.  In addition, these disclosures reveal the strategy or direction of the investigation.

20.   **Susan Schmidt & Peter Baker, "Starr Rejects Proposal on Lewinsky Testimony,"** Washington Post, **February 5, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this article, it is reported that:

> [i]ndependent counsel Kenneth W. Starr yesterday rejected a proposed cooperation agreement from Monica S. Lewinsky's lawyers and gave them until the end of the week to make the former White House intern available for questioning or let her face possible prosecution, according to sources with knowledge of the investigation.  Prosecutors decided the written statement from Lewinsky was not solid enough to form the basis of an agreement because it contained inconsistencies and contradictions.  Lewinsky acknowledged having a sexual relationship with President Clinton in the statement, the sources said, but she gave a muddled account of whether she was urged to lie about that relationship to lawyers in the Paula Jones sexual harassment suit.  (emphasis added).

Much of this article is attributed to sources with knowledge of the investigation. The

confidential information disclosed includes the status of immunity negotiations, the possible

indictment of a target of the grand jury investigation, the credibility of the testimony of a

potential target, and the content of a witness's proffer gathered as part of the grand jury

investigation. The content and context of many of these background statements, particularly

revelations about the prosecutors' reasons for rejecting Ms. Lewinsky's proffer, suggest that the

disclosures came from members of the OIC.

> 21. **Lisa Myers, "Possible Indictment of Monica Lewinsky by Kenneth
> Starr Discussed,"** Today, **February 24, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e). In

this television segment, Ms. Myers reports that:

> <u>NBC news has learned that</u>, for the first time, <u>Ken Starr now is seriously</u>
> <u>considering</u> indicting the former intern. . . . <u>[S]ources close to the investigation</u>
> <u>tell NBC news</u> that [Ms. Lewinsky may never be called before the grand jury],
> that instead of calling her as his key witness, Starr may bring criminal charges
> against her. . . . <u>Lawyers close to the investigation say</u> Starr's team lost what little
> trust they had in Monica's lawyer, William Ginsburg, and thought Monica's
> mother, Marcia Lewis, was not entirely forthcoming after she got immunity, a
> preview of what Monica might do. . . . At this point, <u>sources say</u> prosecutors are
> not sure they would get the truth from Monica. So some see indicting her as,
> <u>quote</u>, "the least bad option." (emphasis added).

Ms. Myers attributes her reporting to sources close to the investigation. These background

sources disclose the status of immunity negotiations and the possible indictment of a target of the

grand jury investigation. These sources also reveal the strategy of Mr. Starr and other

prosecutors regarding the scope, focus, and direction of the grand jury investigation. Given the

nature of the information leaked and the Independent Counsel's admission that members of his

office talk to reporters on a not-for-attribution basis, there is a reasonable inference that these disclosures came from within the OIC.

22.    **John Ellis, "It's the Beginning of the End for Clinton's Presidency,"
       Boston Globe, February 7, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In this article, Mr. Ellis writes that "Betty Currie is not the only White House staff member cooperating with the Office of the Independent Counsel.  According to one reliable source, three other White House employees have spoken at length and in detail with Starr's office about the president's relationship with Lewinsky and his efforts to keep that relationship secret." (emphasis added).  In a statement made the next day at a seminar at Harvard's Kennedy School of Government, Mr. Ellis claimed that the reliable source for his column was "a person in the special prosecutor's office." See Lars-Erik Nelson, "Kenneth Starr's Leaky Boat Looks Like It's Sinking," New York Daily News, February 13, 1998.  According to Mr. Ellis' statements at Harvard and in his column, a member of the OIC disclosed to him the nature of the testimony of several witnesses that was gathered as part of the grand jury investigation.  Such disclosures by members of the OIC, if not satisfactorily rebutted, violate Rule 6(e).

23.    **Scott Pelley, "Kathleen Willey's Grand Jury Testimony Contradicts
       the President's Sworn Deposition," CBS Evening News, March 13,
       1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  Mr. Pelley reports that "sources tell CBS news that prosecutors are now building a perjury case against the president, based on the testimony of Kathleen Willey before the grand jury earlier this

18

week.  CBS news is told that Willey did, in fact, repeat her allegations under oath to the grand

jury and those allegations flatly contradict what the president said in his sworn deposition."

(emphasis added).  In the context of this report and given the Independent Counsel's admission

that members of his office talk to reporters on background, there is a reasonable inference that

this unattributed leak came from within the OIC.  The substance of the information disclosed

pertains to the testimony of a grand jury witness, the prosecutors' strategy, and the scope, focus,

and direction of the grand jury investigation.

> 24.   **Lisa Myers, "Ken Starr Asks for an Emergency Hearing on Executive
> Privilege from the Supreme Court, and Monica Lewinsky Fires
> Lawyer Ginsberg, Hiring Two New Attorneys," NBC Nightly News,
> June 2, 1998**

The Court finds that this news report constitutes a prima facie violation of Rule 6(e).  In

this television report, Ms. Myers states that "[s]ources close to the case say it is not too late for

Lewinsky to get a deal if she tells the full story.  But so far prosecutors see few signals that

Lewinsky herself is in a mood to be helpful.  Remember her visit to the FBI last week to provide

fingerprint and handwriting samples?  Law enforcement sources say the session took an hour

longer than usual, because Lewinsky was, at times, uncooperative.  Tonight, sources close to the

investigation say it will be almost impossible for Lewinsky to get immunity without providing

evidence damaging to the president, that she must choose between protecting herself and

protecting Mr. Clinton."  (emphasis added).  In this report, disclosures are attributed to sources

close to the case, law enforcement sources working with the OIC, and sources close to the

investigation.  The context and substance of these statements implicate a member of the OIC or

an FBI agent working with the OIC as a source of the disclosures, particularly given revelations

ORDERED that the Special Master and any other persons assisting him shall be bound by the secrecy provisions of Rule 6(e) and shall keep any information learned in the course of their duties in strict confidence. All documentary evidence and transcripts of testimony gathered in this matter shall be maintained under seal; it is further

ORDERED that the Special Master shall submit a progress report to the Court on the thirtieth day of each month, or the next business day if the thirtieth day falls on a weekend or holiday, beginning October 30, 1998. Such progress reports shall be submitted in camera by letter directed to the Court with a copy provided to the OIC; it is further

ORDERED that the Special Master shall submit a final report of his findings and conclusions to the Court in an expeditious manner, preferably by the end of November 1998. This report and any supporting evidence shall be submitted in camera to the Court with a copy provided to the OIC; it is further

ORDERED that the OIC may file a response to the Special Master's final report within fifteen days after the report is delivered to the OIC, or the next business day if the fifteenth day after the report is delivered falls on a weekend or holiday; it is further

ORDERED that the Special Master's fees and costs shall be divided evenly between movants (50%) and the OIC (50%) and shall be paid when and as due. The Court retains discretion to reallocate the fees and costs pending the determination of the motions for order to show cause; and it is further

ORDERED that the parties shall submit proposed redactions of the foregoing Order by October 1, 1998.

NORMA HOLLOWAY JOHNSON
CHIEF JUDGE

23