# Exhibit 4

# STARR: WITNESSING FOR THE PROSECUTION

By Susan Schmidt; Dan Morgan November 19, 1998

Independent counsel Kenneth W. Starr was squeamish. During the frenetic 24-hour days of late August and early September, as his office scrambled to finish the report to Congress that would bear his name, the debate kept circling back to the sexually explicit testimony of Monica S. Lewinsky.

"Ken wanted to exclude as much of this as possible," recalled a senior adviser. But several prosecutors who had spent hours debriefing the former White House intern about her affair with the president were adamant. They couldn't suggest to the House of Representatives that Bill Clinton had committed impeachable acts unless they included the details necessary to prove their main contention that the president lied under oath.

The cigar, the phone sex, Clinton's fondling of Lewinsky -- all of it eventually ended up in the 453-page report delivered to Congress Sept. 9, and all of it was released to the public two days later. But the lawyerly calculation that the sex was necessary to make the impeachment case turned out to be a two-edged sword. While the details undermined Clinton's previous denials and legalisms, they also focused much of a shocked public's attention on sex rather than on impeachable offenses, and on Starr's conduct in addition to Clinton's.

Today, as the first witness in the House Judiciary Committee's truncated impeachment hearings, Starr will be able to publicly defend himself and his report for the first time. And it was clear from his opening statement, released last night, that he will aggressively confront the accusations of Clinton supporters that he is some sort of Puritan Lone Ranger who, together with an office full of overzealous prosecutors, abused his power in a single-minded attempt to throw the president out of office.

Among other issues likely to be explored are the circumstances under which Starr's mandate to investigate the Clintons' Whitewater land dealings was expanded to include investigation of the president's relationship with Lewinsky, and the treatment of Lewinsky by prosecutors in their initial encounter.

Interviews in recent weeks with current and former employees of Starr's office provide revealing glimpses behind a curtain that is still mostly drawn over these and other controversial episodes of its work, and decisions Starr and his staff made at crucial moments in the last few months.

They include:

The office's unpublicized decision in April to draw its four-year investigation of Hillary Rodham Clinton's role in the Whitewater land deal to an end after concluding there was insufficient evidence to charge her with any crime.

The reservations expressed by key lawyers in July that without Lewinsky's still unsecured testimony they lacked sufficient evidence to support the planned impeachment report to Congress.

The intense preparation undertaken by prosecutors for the questioning of Clinton before the grand jury in August, and the initial concerns when it was over that they had failed to pin him down.

The internal debates over what details to include in the final report, and a last-minute rewrite to add new language to one of its most controversial counts, alleging presidential "abuse of power." The interviews also revealed the unwavering conviction of Starr's team, after months of criticism, in the correctness of its course. There is no public second-guessing.

"The office feels that it did its job," said Starr spokesman Charles G. Bakaly III. "To a person, they did their duty. We did what we were supposed to do."

Starr's close advisers acknowledge they have irreparably lost part of the perception battle. "To some extent, the attacks have succeeded," said Sam Dash, the Watergate veteran who is now a paid consultant to the independent counsel. But Dash and other Starr lawyers say their problem has been one of bad public relations. "The entire investigation is the subject of so much spin, and there is such a myth of wrongdoing by the office," Dash lamented. Questions From the Start

It was still the early days of the Lewinsky investigation when Clinton adviser James Carville openly declared "war" on the independent counsel, branding Starr a "sex-obsessed" prosecutor.

Throughout Starr's tenure as independent counsel, questions have been raised, not only by the president's supporters, about his motives and actions. In 1994, he was selected for the job of investigating the Clintons' long-ago Arkansas land dealings by an appellate court panel that included two conservative judges with ties to Clinton opponents in Congress. He had begun his initial investigation of the Lewinsky matter before seeking Justice Department approval for expanding his mandate. Once he did seek it, he failed to explicitly remind Attorney General Janet Reno of his earlier contacts with attorneys for Paula Jones -- whose sexual harassment case against the president had led to Lewinsky. His prosecutors had played hardball with Lewinsky when they first questioned her in January following a sting they conducted at an Arlington hotel.

Once the Lewinsky case was under way, David E. Kendall, the president's private attorney who has fought Starr since the early days of Whitewater, blasted the independent counsel for alleged leaks to the media designed to damage the president, and asked Chief U.S. District Judge Norma Holloway Johnson to investigate. Johnson named a special master -- sources said he is U.S. Appeals Court Senior Judge John W. Kern III -- to determine whether Starr and his lawyers illegally revealed grand jury information. That probe is still under way.

Starr has provided responses to many of these criticisms, and some already have been examined and discarded as baseless by the Justice Department.

But in April, pressure on the Office of the Independent Counsel (OIC) was intense. The Lewinsky matter remained murky, and many believed Clinton -- who had categorically denied a sexual relationship with Lewinsky -- was being unjustly persecuted. Contributing to this belief was the long-running and still inconclusive Whitewater investigation. While there had been a number of indictments, and 14 convictions, in the four-year investigation, the probe had not yielded charges against the president or Hillary Clinton.

Starr's grand jury in Little Rock, where the Whitewater investigation was based, was set to expire and disband on May 7. On Saturday, April 25, the independent counsel, his chief Little Rock deputy, W. Hickman Ewing Jr., and three other lawyers had questioned Hillary Clinton in the Yellow Room of the White House. Two days later, the entire OIC legal team from Washington and Arkansas gathered for a marathon session in Starr's headquarters at 1001 Pennsylvania Ave. Although no one outside the office knew it at the time, they closed the book that day -- barring new evidence -- on the investigation of the first lady.

The conference lasted from 8 a.m. until midnight, before breaking up with a consensus decision: The OIC had insufficient evidence to charge Hillary Clinton with any wrongdoing connected to her work at the Rose Law Firm in Little Rock. Although Starr's statement prepared for today's hearing says he found insufficient evidence for charges against the president related to the Whitewater investigation, it draws no such conclusion about Hillary Clinton. Critics say that Starr abandoned work on Whitewater, without ever giving an accounting after four years of effort, when a better scandal came his way. His zeal for the unsavory Lewinsky matter, they say, is evidence of his personal quest to destroy the president.

Many of those who have worked closely with Starr behind the locked doors on Pennsylvania Avenue insist that description misses the essence of Starr's operation. They point to the decision not to indict Hillary Clinton as an example of prosecutorial restraint. In choosing to put virtually all the office's resources into the Lewinsky probe, they see a desire to bring an end as quickly as possible to an investigation slowed by a White House bent on delay.

And, these Starr colleagues say, the Hillary Clinton decision shows that Starr is not a Lone Ranger making decisions based on personal motives, but the coordinator of a team whose deliberative discussions are marked by open debate and objective weighing of the facts. When a big decision is at hand, each of the 30 or so lawyers in the office, whether involved in the issue or not, is expected to examine all the evidence, come to the table with an opinion, and make himself heard.

Starr, his colleagues suggest, is a scholarly but involved senior partner who makes the final call only after hearing from his diverse group of subordinates -- street-wise career government prosecutors and brainy professors, Democrats and Republicans.

"The process calls upon each attorney -- drawing upon his or her background and experience -- to offer views on issues in question," Starr says in his prepared testimony. "This deliberative process is laborious, sometimes tedious. But it is an attempt to ensure that our Office makes the best decisions it can. I have drawn upon a vast

array of experienced prosecutors and investigators because I was sensitive to . . . the fact than an independent counsel exists outside the Justice Department and is an unusual entity within our constitutional system."

Starr's statement says that "at the end of the day, I -- and no one else -- was responsible for our key decisions." But there is no question that the team he assembled, composed of two distinct groups, is an aggressive one, and that its feelings of being engaged in a virtual war against the White House increased as time went on.

One half of the team is a tightly knit "brain trust" made up of highly pedigreed academic attorneys, some with a taste for the intellectual stimulation of constitutional battles. They include University of Michigan law professor Ronald J. Mann; former Senate Watergate counsel Dash; and Brett M. Kavanaugh, a young Starr protege who worked with him at the solicitor general's office in the early 1990s and clerked at the Supreme Court. One of the early brain trusters was University of Illinois professor Ronald D. Rotunda, brought on board in 1997 at a retainer of $115,000 a year. An expert on impeachment, Rotunda has argued in legal writings that a sitting president can be indicted.

The brain trust also includes University of Illinois professor Andrew D. Leipold; a friend of Mann's from their Supreme Court clerk days; and Stephen Bates, who moonlights as literary editor for the Wilson Quarterly.

These academics, some of whom have come and gone on a consulting basis, others who have been with Starr from the start, worked on -- and won -- a proliferation of constitutional litigation sparked by the Lewinsky investigation, from executive privilege and Secret Service testimony, to the subpoenaing of Lewinsky's book purchases. Leipold, Kavanaugh and Bates would eventually be on the core team writing the impeachment report.

Like many in the cloistered office, the front-line prosecutors sometimes felt under siege, a feeling engendered in part by what Starr charged -- and the White House denied -- were attempts to smear their careers with leaks to the media raising ethics questions. Starr's prepared statement maintains that "the character and conduct of the men and women of our Office . . . have been badly distorted."

The prosecution group includes Jackie M. Bennett, an aggressive former top prosecutor in the Justice Department's public integrity section; former Anne Arundel County prosecutor Robert J. Bittman; and Michael W. Emmick, a Starr recruit from the U.S. attorney's office in Miami.

Starr is likely to be grilled today about reports that his prosecutors have mistreated witnesses, including Lewinsky herself. Lewinsky's first lawyer, William H. Ginsburg, claimed that after prosecutors confronted her for the first time in a sting arranged with the help of her onetime confidante, Linda R. Tripp, they improperly held her "hostage" for 12 hours without an attorney. This episode gave rise to an entire secret court fight -- part of a larger battle to enforce an immunity deal with Starr -- about whether Lewinsky had been mistreated by Bennett and Emmick. Ginsburg lost the immunity argument, but the ruling is still under seal.

Months later, after Lewinsky began cooperating with Starr, she told the grand jury that when she asked to call her mother that night, Bennett replied: "You're 24; you're smart, you're old enough, you don't need to call your mommy." Recounting the experience was so painful to her that she asked Emmick to leave the grand jury room when she testified. The Lewinsky Deal

In early August, "Hick" Ewing, the head of the OIC's Little Rock office and chief Whitewater investigator, was summoned to Washington for a star performance. The man perhaps most reviled by the White House -- Clinton adviser Sidney Blumenthal publicly branded him "a religious fanatic" -- would play the president in Starr's moot court as the team prepared to question Clinton.

Only a month earlier, some key Starr advisers were in doubt as to the future of the investigation, and progress had seemed agonizingly slow. An impeachment report had been in the works for months, but Dash and Kavanaugh raised a red flag in early July, writing memos that raised serious questions about whether such a report should proceed in the absence of more evidence -- especially testimony from the still-silent Lewinsky.

Those sentiments helped pave the way for two decisions. On July 17, Starr sent an unprecedented subpoena to Clinton, who had evaded numerous earlier, less legally irresistible attempts to secure his testimony. And, on July 22, Starr himself telephoned Lewinsky lawyer Jacob A. Stein in an effort to end months of legal wrangling over her testimony.

The OIC had been wrestling for months over what to do about Lewinsky. What would the prosecutors do if, in the end, she simply refused to cooperate? If they indicted her for perjury -- based on her Jones case affidavit denying a sexual relationship with Clinton -- they'd face a firestorm of public criticism and a jury might refuse to convict her. But if they immunized her and compelled her testimony, they would forgo the right to proceed against her with no assurance she'd tell the truth.

The deal they finally made with her accepted the offer she had first made in February -- she would testify as to the details of a sexual affair, but would deny specifically being told to lie under oath by the president in the Jones case. On July 27, the prosecutors flew to New York to meet with Lewinsky. The next day, the deal was signed. Emmick and Karin Immergut, a former Portland, Ore., assistant district attorney, took the lead in questioning Lewinsky in interviews, a role they would continue before the grand jury,

"There were no hard camps on Monica's cooperation. Once we had the New York interview, no one opposed doing the deal," said one attorney. But that unanimity about how to proceed might have fallen apart had Lewinsky balked or had prosecutors doubted her veracity. "We would have had to move to Plan B -- that's where there would have been drama and problems," he said.

Lewinsky's cooperation -- and the blue dress she handed over containing the president's DNA -- presented a problem for Clinton: How would he reconcile his own sworn Jones testimony with the story that Lewinsky now was prepared to tell under oath and the evidence Starr had amassed.

At the White House, lawyers and political aides were unaware of the breakthrough with Lewinsky as they pondered Starr's subpoena and Clinton finally agreed -- against his lawyers' advice -- to testify "voluntarily" if the subpoena were withdrawn. By the time the agreement was announced July 29, Monica had already signed up.

Clinton's testimony was scheduled for Aug. 17; as prosecutors began to prepare they decided Ewing was a natural to play the president in their practice runs. He knew Clinton best. He had interviewed scores of Clinton's Arkansas friends and associates -- many of them repeatedly -- in the four years he spent overseeing the Whitewater investigation. He had interviewed Clinton about Whitewater and the death of former White House counsel Vincent W. Foster Jr., and had had plenty of opportunity to judge the ways the president responded to probing questions.

The lawyers selected to question the president were Starr's three Washington deputies: Bittman, who had day-to-day management responsibility for the Lewinsky probe and a matter-of-fact interviewing style; Solomon L. Wisenberg, regarded in the office as a facile inquisitor with mastery of the grand jury testimony; and Bennett, a hardballer often called on to question hostile witnesses. Starr would look on from above the fray.

They conducted three mock sessions at the Pennsylvania Avenue office, each four hours long -- precisely the amount of time they would be allowed to question Clinton. The lawyers tried to anticipate every possible response he might give and submitted to critiques from their colleagues. "I don't think an alternative existed we didn't discuss," said Rotunda.

Starr was concerned that his team appear respectful of the presidency and wanted to proceed gingerly, but Wisenberg, Bakaly and several others argued -- with some success -- for a more conventional cross-examination, several lawyers said.

Among their scenarios: Clinton would admit he lied about Lewinsky; he would continue to deny a relationship; or he would make a statement containing admissions but insisting his earlier testimony had been legally accurate. The last scenario was the correct one.

"Hick had him down pretty good," said Rotunda. "It looked like Hick was running the clock, which is what Clinton did."

When Aug. 17 arrived, the OIC team -- minus Ewing -- arrived at the White House just after noon. A foretaste of the battle came as Kendall took Starr aside for a private message, according to Rotunda and several other OIC lawyers who heard about it later.

"If you get into detail, I will fight you to the knife both, here and publicly," said Kendall. The confrontation stunned the courtly Starr. "Four hours later Starr came back and met with all the lawyers, 20 or 25 of them. It was the first thing he said," Rotunda recalled.

The president's intention to make some admission of an "inappropriate" relationship with Lewinsky had already been telegraphed in news reports, and he kept his temper throughout the four-hour session. But his feelings about it were on display that night, when he went on national television to charge that his privacy had been invaded as part of a partisan investigation that had gone on too long.

The OIC lawyers who interviewed Clinton initially came away from their encounter feeling much the way the public did when the videotape of the testimony was released by the House in September: that Clinton had acquitted himself fairly well considering the circumstances, and had largely avoided being pinned down. But on paper, when the transcripts came back, the prosecutors thought they had built a strong case.

"Given the route he took, I thought we did pretty good," said Rotunda. "Some people weren't sure, but when they saw the {transcripts of the} testimony, they were. . . . Clinton made important admissions, he said some things that just didn't ring true, and he refused to answer some things."

The decision about what to do next was unanimous.

"Nobody felt the standard had not been met to file an impeachment report," said one OIC lawyer. Writing the Report

As Starr and his staff wrestled with how to write their impeachment referral, the independent counsel was wary about Lewinsky's explosive testimony. Immergut, New York lawyer Mary Anne Wirth and Emmick had spent hours with her, and were most familiar with her story. They made the case that much of the sexual detail was relevant. "It is the detail that makes the thing ring true," was how they put it, according to Rotunda.

Lewinsky's testimony was more believable, they argued, precisely because some of the acts she described -- such as Clinton talking on the phone while receiving oral sex -- were debasing to her. "Some of the women prosecutors said, You have to put in the information about phone sex, it shows an intimate relationship between them,' " said Rotunda.

The debates took place in a deadline frenzy. The OIC, in overdrive since January, had become a 24-hour shop. "It was like a supermarket, we were there all the time," said Rotunda. "Paralegals and chaired professors were sitting around proofing. At the end, we had to draft everybody."

When the debating was over, not all of the sex stayed in. Starr allowed mention of the phone sex conversations, for example, but vetoed including their content.

After Clinton's Aug. 17 testimony, Starr had wanted the report sent to Congress as soon as it could be pulled together. Late September was too close to the election, Starr believed. The office decided to shoot for delivery to Congress Sept. 9, the first day the House would be in session after its August recess.

The sense of urgency was heightened, several lawyers said, when Kendall publicly threatened in early September to go to court to block delivery of the report.

Brain trusters Leipold, Kavanaugh, and assistant independent counsel Julie Myers wrote a section laying out possible grounds for an impeachment, getting constant updates about Lewinsky's ongoing testimony from Immergut, Wisenberg and Emmick. The longer narrative section of the report -- which had been in preparation since April -- was principally written by Bates and assistant independent counsel Craig Lerner. Everyone in the office read the documents. Starr was the ultimate editor.

They met their self-imposed deadline: Delivery Day was on Sept. 9. The referral remained unread by anyone, under lock and key on House premises, until Sept. 11, when House leaders decided to post it on the Internet at the same time it was distributed to Congress.

"We had no way of knowing in advance of submitting the referral, and we did not know, whether the House would publicly release both the report and the backup materials," Starr said in the testimony prepared for today's hearing. "As a result, we respectfully but firmly reject the notion that our office was trying to inflame the public."

But even now, after all the hue and cry, some of Starr's advisers show little inclination to second-guess the inclusion of explicit details. "It's clinical, not graphic. I can't imagine anyone getting a rise out of this," argued Rotunda. "The president was parsing the English language -- he was slicing the baloney very thin."

Soon, the sensation generated by the narrative about the Clinton-Lewinsky relationship overshadowed the second chapter of the report, which laid out 11 "acts that may constitute grounds for an impeachment."

That bill of particulars offered conclusions that White House allies and some legal experts have argued are not necessarily supported by the testimony and evidence cited.

And another criticism quickly emerged: Starr may have exceeded his mandate in the way in which the report was written. Portions are interpretive, and Democrats argued that Starr had strayed far from his earlier public promise to offer up "just the facts."

The independent counsel statute is silent about how evidence should be packaged or presented -- it says only "an independent counsel shall advise the House of Representatives of any substantial and credible information . . . that may constitute grounds for an impeachment" -- and Starr's report was the first time the provision has been used.

"We debated what was the right way to do this," said Bakaly. "Starr felt there was a duty to explain his analysis and his judgment."

Ground 11 contended that Clinton should be impeached because he had failed to "faithfully execute the laws." The grab-bag charge, including Clinton's insisting to the American public that he never had sex with "that woman," looked to many critics like an attempt to throw the president out of office simply for mounting a vigorous defense. The strongest criticism was directed at Starr's contention that the president's assertion of executive privilege to shield some aides from testifying was in itself illegal. That criticism was hardly anticipated by the OIC. In fact, Ground 11 was being rewritten even as government vans were waiting to take the finished report up to Capitol Hill. Dash, the old Watergate hand, urged the changes, arguing Ground 11 would be strengthened by saying that the president "unlawfully" invoked executive privilege.

A last-minute debate ensued: Dash argued the president's use of executive privilege was an "unlawful" abuse of his office because his intent was to deceive the grand jury. Some of the brain trusters disagreed, but Dash, lawyers said, prevailed upon Starr and the change was made.

The government vans rolled up to Capitol Hill with the report, an hour later than planned. CAPTION: President Clinton is subject of prosecutor's referral. ec CAPTION: Kenneth W. Starr sent report to Congress on alleged offenses. ec CAPTION: In September, U.S. Capitol police escorted boxes of documents detailing what independent counsel Kenneth W. Starr called impeachable offenses. ec

💬 0 Comments

The story must be told.
Your subscription supports journalism that matters.

Try 1 month for $1